IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MERRILL LYNCH, PIERCE, FENNER & SMITH, P.C., | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 3:06-CV-0575-P |
| GREYSTONE SERVICING CORPORATION, INC. and SOUTH SIDE PLAZA 455 LTD., LLP, | § § § § § | |
| Defendants. | § § | |

## MEMORANDUM OPINION AND ORDER

Now before the Court are Defendants Greystone Serving Corporation, Inc.'s and South Side

Plaza 455 Ltd., LLP's Motions to Dismiss, filed June 12, 2006. After careful consideration of the

Parties' briefing and the applicable law, the Court hereby DENIES Greystone's Motion to Dismiss

and DENIES South Side's Motion to Dismiss.

## BACKGROUND

Defendant South Side Plaza 455 Ltd., LLP ("South Side") is the owner of a residential rental

and commercial real estate property known as South Side on Lamar (the "Property") in Dallas,

Texas. (Compl. ¶ 7.) In June 1999, South Side financed the construction and initial operation of

the Property with the proceeds from a $64 million loan (the "Loan") from Reilly Mortgage Group,

Inc. ("Reilly"). (Compl. ¶ 8.) The Loan was to mature on July 1, 2042, carried an interest rate of

7.75%, and was secured by a mortgage on the Property. (Compl. ¶ 8.) The United States

Department of Housing and Urban Development ("HUD") insured the repayment of the Loan. (Compl. ¶ 9.)

The Loan Agreement contained a provision, pursuant to HUD regulation 24 C.F.R. § 200.87(c), that prohibited South Side from prepaying the Loan in whole or in part prior to May 2012 ("Prepayment Provision").[1] (Compl. ¶ 11.) However, the Loan Agreement also included an exception to the Prepayment Provision, pursuant to HUD regulation 24 C.F.R. § 200.87(d), that allowed prepayment in the event that HUD determined that prepayment would avoid a mortgage insurance claim and was in the best interests of the federal government.

In order to obtain funding for the Loan, Reilly issued a security (the "Security") backed by the Loan and guaranteed by the Government National Mortgage Association ("Ginnie Mae"). (Compl. ¶ 14.) Ginnie Mae is a government corporation within HUD established to guarantee mortgage-backed securities, pursuant to 24 C.F.R. Part 320. The Security had a face value of approximately $64.1 million and carried a pass-through interest rate of 7.5%, which was the interest rate of the Loan less guarantee and servicing fees. (Compl. ¶ 14.)

Plaintiff Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Plaintiff" or "Merrill") purchased the Security in July 2002, divided the Security into two equal shares, and conveyed the Security to two different trusts organized as Real Estate Mortgage Investment Conduits ("REMICs"). (Compl. ¶ 18.) According to the Complaint, in late 2002-early 2003, South Side represented to Merrill that the Property was financially sound. Merrill then acquired unique interests in the REMICs, which are

---

[1] Prepayment restrictions, like the Prepayment Provision here, are common provisions in commercial mortgage-backed securities and are a significant inducement to investors to purchase such securities. (Compl. ¶ 12.) Prepayment restrictions insulate the holder of the security against the reinvestment risk of early repayment. (Compl. ¶ 12.)

referred to as "IO Strips," pursuant to which Merrill was to receive periodic payments of interest only, consisting in part of interest paid on the Loan. (Compl. ¶ 18.) Merrill alleges that it would not have purchased its interests in the REMICs had South Side not confirmed the Property's financial viability. (Compl. ¶ 19.)

Pursuant to these sales of the Security, Reilly (the issuer of the security) and the REMICs (the owners of the Security) entered into the Administration Contract, which obligated Reilly to work in good faith to service the Loan, administer the Security, and respond to missed payments by South Side. The Administration Contract also incorporated the Prepayment Provision, which the REMICs used as an inducement for those acquiring an interest therein. (Compl. ¶¶ 31-32.) Reilly also entered into a Servicing Agreement and a Guarantee Agreement with Ginnie May, whereby Reilly promised to work in good faith to service the Loan, administer the Security, and respond to missed payments by South Side. (Compl. ¶ 34.)

Plaintiff contends that after it purchased its interests in the REMICs, Defendants Greystone Servicing Corporation, Inc. ("Greystone") and South Side (collectively, "Defendants") conspired to circumvent the Prepayment Provision, refinance the Loan at a lower interest rate, cause HUD to reinsure the refinanced loan, and sell a new security to a new investor at a substantial profit. (Compl. ¶¶ 21-30.) These profits (in the amount of $7.2 million) came at the expense of the Security owners and the holders of the IO Strips (in the amount of $12 million) who are suing to recover their losses. (Compl. ¶¶ 21-28, 44, 47.) In order to persuade HUD to waive the Prepayment Provision and to complete their scheme, Defendants misrepresented to HUD, and convinced HUD, through a variety of acts and statements, that the financial viability of the Property and South Side's ability to repay the Loan were in jeopardy. (Compl. ¶ 25-26.)

Plaintiff contends that Greystone, as a successor of Reilly, assumed Reilly's duties with respect to the Administration Contract and the Servicing and Guarantee Agreements. (Compl. ¶¶ 29-31.) Plaintiff filed this lawsuit against Greystone and South Side alleging claims for breach of these contracts, tortious interference, and negligent misrepresentation, among others.[2]

## DISCUSSION

Mortgage-backed securities, or "MBS", are a type of fixed-income investment. The most common type of MBS is a simple "pass-through" security that represents ownership of an underlying pool of mortgage loans. Investors who own the MBS (in this case, the REMICs) are entitled to receive collections of interest and principal. In MBS jargon, the payments on the loans are "passed-through" to the investors. However, a small portion of the interest collected is not passed-through. Instead, it is used to cover the expenses of the deal. Thus, an MBS has a "pass-through rate," which is the net rate at which investors receive interest on the balance of the mortgage loans backing the security. For example, if the mortgage loans backing an MBS have interest rates of 6.5%, the MBS might have a pass-through rate of 6%. The difference, 0.5%, covers expenses.

Every MBS has a "servicer." The servicer is the company that collects payments from borrowers and handles the administrative task of aggregating the collected funds and distributing them to investors. Naturally, the servicer receives a fee for its services. In most MBS, the fees to the servicer consume all or nearly all of the difference between the interest rate on the mortgage loans and the pass-through rate on the security. In many cases, the lender that originated the mortgage loans (in this case, Reilly) becomes the servicer for the MBS comprising those loans.

---

[2]   Merrill seeks to recover for its injuries and also for injuries suffered by the REMICs. The REMICs have assigned their claims against Defendants to Merrill.

Most MBS are issued or guaranteed by one of three mortgage-related "agencies" or "government sponsored enterprises:"(1) Ginnie Mae, (2) Fannie Mae, and (3) Freddie Mac. Each "agency MBS" has the benefits of a credit guarantee from its related agency. Those guarantees insulate MBS investors from credit risk on the underlying loans. With respect to Ginnie Mae, the federal government backs Ginnie Mae's guarantees.

Title III of the Housing and Urban Development Act of 1968 (12 U.S.C. § 1716 *et seq.*) established Ginnie Mae, a government corporation within HUD. Ginnie Mae is administered by the Secretary of HUD and the President of Ginnie Mae. Ginnie Mae exists to support the federal policy of promoting home ownership. Ginnie Mae is structured to increase the availability of investment capital for housing finance by fostering a secondary mortgage market. Ginnie Mae provides liquidity to the secondary mortgage market by attracting capital to the residential mortgage markets.

In 1968, Ginnie Mae initiated its guarantee program for mortgage-backed securities. In 1970, Ginnie Mae began to guarantee the timely payment of principal and interest on pass-through securities issued by private mortgage originators and backed by government-insured mortgages. A Ginnie Mae guarantee carries with it the full faith and credit of the federal government. Ginnie Mae is authorized to guarantee securities issued by approved private issuers and backed by federally-insured mortgages. In other words, the only mortgage loans that qualify for inclusion in Ginnie Mae pools are ones that are insured or guaranteed by the federal government.

Eligible mortgages are put into groups or pools by a "Ginnie Mae issuer," which is an entity that has been approved by Ginnie Mae to pool government mortgages and sell, or "issue," Ginnie

Mae-guaranteed securities. By selling this security to investors, the issuer is able to recapture the outstanding balance of the mortgages, which can then be used to fund more mortgages.

Since 1991, Ginnie Mae has attempted to strengthen its secondary market presence, principally through the development of its Real Estate Mortgage Investment Conduit program (REMIC). A REMIC is a mortgage bond that separates mortgage pools into different risk classes and maturities. Ginnie Mae-REMICs are backed by Ginnie Mae-guaranteed MBS. Those who wish to be REMIC sponsors must first apply for Ginnie Mae approval, and only then may they be able to form a trust to issue structured Ginnie Mae-guaranteed REMICs.

## DEFENDANTS' RULE 12(b)(1) MOTIONS TO DISMISS

### A. Lack of Subject Matter Jurisdiction.

Both Defendants filed motions to dismiss this lawsuit based on Federal Rule 12(b)(1) - lack of subject matter jurisdiction.[3] Defendants contend there is no federal question jurisdiction because Plaintiff has neither pled a federal cause of action nor established the existence of a federal interest. Plaintiff responds by arguing that its claims "arise under" federal law because they involve uniquely federal interests and because Plaintiff's contract claims necessarily depend on resolution of substantial questions of federal law.

The critical requirement for general federal question jurisdiction under 28 U.S.C. § 1331 is that the case "arise[] under the laws" of the United States. 28 U.S.C. § 1331. Federal question jurisdiction can arise in a variety of situations and certainly the phrase "arising under federal law" masks a multitude of issues. *See Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S.

---

[3] Merrill concedes that diversity of citizenship does not exist in this case.

1, 8 (1983). However, the Supreme Court has declined to recognize an "automatic test" for determining when federal question jurisdiction is present. *See Merrill Dow Pharmaceuticals, Inc. v. Thompson*, 478 U.S. 804, 814 (1986). Rather, the Supreme Court has held that the question of whether a claim "arises under" federal law must be determined by reference to the "well-pleaded complaint." *See Franchise Tax Bd.,* 463 U.S. at 9-10.

A case "arises under" federal law within the meaning of § 1331 if (1) federal law creates the cause of action or (2) the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law. *See Oliver v. Truckline Gas Co.*, 789 F.2d 341, 343 (5th Cir. 1986). Federal question jurisdiction may exist over claims arising under federal statutory law or federal common law. *See Frank v. Bear Stearns & Co.*, 128 F.3d 919, 922 (5th Cir. 1997). In those cases where the cause of action is not created by federal statutory law, the existence of federal question jurisdiction depends on an evaluation of the nature of the federal interest at stake. *See id.* "In suits between private parties, federal common law exists in the narrow class of cases where federal rules are necessary to protect uniquely federal interests which the application of state law would frustrate." *Id.* at 923.

Causes of action created by state law may give rise to federal jurisdiction only when the claims created by state law necessarily turn on some construction of federal law. *See Franchise Tax Bd.*, 463 U.S. at 9. Thus, when the law that creates the cause of action is state law, original federal jurisdiction is available only when it appears that some substantial, disputed question of federal law is a necessary element of one of the well-pleaded state claims. *See id.* at 12. The Supreme Court stated in *Franchise Tax Board,* "[e]ven though state law creates [the plaintiff's] causes of action, its case might still 'arise under' the laws of the United States if a well-pleaded complaint established

that [the plaintiff's] right to relief under state law requires resolution of a substantial question of federal law in dispute between the parties." *Id.* at 13. However, the mere presence of a federal issue, no matter how much it may dominate the case, is insufficient to confer federal question jurisdiction. *See Oliver*, 789 F.2d at 343. "[T]he presumption is that every federal court is 'without jurisdiction' unless 'the contrary appears affirmatively from the record.'" *Id.* (citation omitted).

South Side and Greystone move to dismiss this case because there is no federal question presented on the face of Plaintiff's Complaint. Plaintiff argues that because the contracts at issue "implement the National Housing Act and were drafted, insured, approved, guaranteed, and in some cases, were entered into by HUD," federal common law should be applied and thus, federal jurisdiction exists. Plaintiff explains that its claims are based on a series of agreements that incorporate HUD and Ginnie Mae regulations and policies adopted pursuant to the National Housing Act. Plaintiff reasons that because its breach of contract claims involve important aspects of Ginnie Mae's mortgage-backed securities program and its REMIC program and because the imposition of liability in this case will directly affect HUD by establishing the rights and obligations of participants in its program, this case falls within the narrow class of cases where uniform federal rules are necessary to protect uniquely federal interests.

"'[T]he mere fact that a court necessarily must interpret federal law or federal regulations to determine the merits of a claim is insufficient to confer federal jurisdiction." *Nelson v. Mitchell Energy Corp.*, 941 F. Supp. 73, 75 (N.D. Tex. 1996) (Means, J.). "Controversies directly affecting the operations of federal programs, although governed by federal law, do not inevitably require resort to uniform federal rules." *United States v. Kimball Foods, Inc.*, 440 U.S. 727-28 (1979). "Whether to adopt state law or to fashion a nationwide federal rule is a matter of judicial policy 'dependent

upon a variety of considerations always relevant to the nature of the specific governmental interests and to the effects upon them of applying state law.'" *Id.* (citation omitted).

In this case, Reilly, the lender, financed the Loan to South Side in 1999. HUD insured the repayment of the Loan pursuant to federal statute (National Housing Act § 221(d)(4)). *See* 12 U.S.C. § 1715l(d)(1). Reilly then placed the Loan into a single-mortgage pool that was wrapped with the Security. Reilly next issued the Security, backed by the HUD-insured Loan. The principal and interest payments paid by South Side on the Security were guaranteed by Ginnie Mae in accordance with Ginnie Mae's regulations at 24 C.F.R. § 320 *et seq*. The Security, in turn, was then combined with other mortgage-backed securities into a Ginnie Mae-structured REMIC. Merrill purchased the Security in July 2002 and then conveyed the Security to the REMICs. Merrill then acquired interests in the REMICs pursuant to which Merrill was to receive periodic payments of interest.

All of these relationships were governed by contracts that contained essential terms dictated by federal regulations. Contracts were entered into between Reilly and the REMICs and between Reilly and Ginnie Mae, both of which obligated Reilly and its successor, Greystone, to work in good faith to service the Loan, administer the Security, and respond to missed payments by South Side.

The mortgage program that is at the core of this case was implemented by the federal government to attract investors to finance home growth and to further the governmental policy of providing affordable housing. The government accomplishes these objectives by providing investors with a system that offers a fixed rate of return (fixed by contract) and a governmental guarantee on the loans. The contracts underlying the transactions and relationships in this case provided for the issuance of a security backed by the federal government and guaranteeing a fixed rate of return. Many

of the terms of these documents are standardized pursuant to federal regulations governing Ginnie Mae transactions.

This case involves allegations that a contracting party made misrepresentations to HUD that ultimately caused HUD to make a decision that harmed investors, including Plaintiff. Allowing program participants to abuse the system in this type of circumstance will certainly compromise the integrity of this federal housing program. Furthermore, the contracts at issue were created in the context of federal law and the remedies implicate federal interests. Participants in these federal mortgage programs are entitled to uniform interpretation of these contracts. Thus, the Court finds that the Complaint sufficiently implicates federal law so as to warrant the creation of a federal body of law in this area.

**B.     Court's Jurisdiction to Review Agency Decision (*Greystone*).**

Greystone posits that at their core, Merrill's claims against Greystone constitute an improper attempt to obtain judicial review of HUD's discretionary decision. Greystone concludes that because the Court has no authority to review HUD's decision, Plaintiff has no standing to seek such a review. However, the issue of whether an agency action is subject to judicial review is a jurisdictional issue, not a standing issue. *See Mount Evans Co. v. Matigan*, 14 F.3d 1444, 1448 (10th Cir. 1994).

The precise issue for the Court to determine is not whether HUD's administrative decision is subject to judicial review - for both Greystone and Merrill appear to agree it is not - rather, the Court must determine as part of its jurisdictional analysis whether Plaintiff's claims amount to an improper request for judicial review of a HUD decision or whether Plaintiff has asserted legitimate breach of contract claims against Greystone.

The Court does not accept Greystone's characterization of this case as an improper attempt to get judicial review of HUD's decision to waive the Prepayment Provision. Rather, the Court concludes that it has jurisdiction to hear this case because it is being asked to resolve as part of its consideration of this action on its merits, whether Greystone wrongfully induced HUD into overriding the Prepayment Provision. Merrill's issue - and the Court's issue to resolve - is whether Greystone's conduct was unlawful, not whether HUD's decision was erroneous. Testimony concerning Defendants' alleged manipulation of the HUD waiver process may be considered by the fact-finder in determining whether Plaintiff satisfied the elements of its claims - the same way other testimony elicited in Plaintiff's case may be considered.[4]

## II. GREYSTONE'S RULE 12(b)(6) MOTION TO DISMISS

In addition to its argument that this Court lacks jurisdiction to hear this case, Greystone argues that Plaintiff's claims against it should be dismissed for lack of standing to sue and failure to state claims for breach of contract and equitable relief. The Court will address each of these issues in turn.

### A.    Standing.

Greystone contends that Plaintiff's lawsuit should be dismissed in its entirety because Plaintiff cannot demonstrate standing to bring suit against Greystone for any of the allegations in its Complaint.

---

[4] Greystone cites *Hahn v. Gottleib*, 430 F.2d 1243, 1249-51 (1st Cir. 1970) in support of its position that Plaintiff's claim is an improper request for judicial review of HUD's waiver decision. Yet *Hahn v. Gottleib* differs considerably from this case in some crucial respects. *Hahn* involved tenant plaintiffs who protested a rent increase before the FHA and, when the tenants' protest was rejected by the FHA, asked the federal district court to review the agency's adverse decision. The court in *Hahn* held there is no judicial review of the FHA's administrative decision to grant a rent increase. By contrast, this case is a breach of contract case in which the investor plaintiff is seeking monetary damages from Greystone - it is not seeking a reversal of HUD's decision, which appears to be final at this point and which this Court is without authority to do. Rather, Merrill is proceeding against Greystone for its alleged wrongful conduct and asks the Court to impose liability against it as a result of its actions.

The Supreme Court in *Lujan v. Defenders of Wildlife*, held that a plaintiff must establish three elements to have standing to bring a lawsuit: First, the plaintiff must have suffered an "injury in fact"- an invasion of a legally protected interest which is (a) concrete and particularized and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of - the injury has to be "fairly . . . traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." 504 U.S. 555, 560-61 (1992).

Greystone argues that Plaintiff lacks standing to sue because its injury was caused by HUD's decision to waive the prepayment restrictions. Greystone maintains that but for HUD's decision to waive the Loan's Prepayment Provision, Plaintiff would have no injuries. (Resp. at 8.) Plaintiff responds by arguing that HUD's decision does not disturb the causal connection between Greystone's actions and Plaintiff's injuries. Plaintiff notes that to establish a causal connection between the injury and the complained-of conduct, the injury need only be "fairly traceable" to the challenged action of Defendants. *See Lujan*, 504 U.S. at 560-61. Greystone counters this argument by 'clarifying' its position. It maintains that it "does not assert that HUD's decision itself denies Plaintiff standing to sue. Rather [Greystone] argues that the Court cannot review HUD's decision, which in turn denies Plaintiff's ability to claim an injury by any action of Greystone or that this Court may redress Plaintiff's alleged injury." (Reply at 4.) Yet, Greystone goes on to say that "Plaintiff's alleged injury is not 'fairly traceable' to Defendant's alleged actions . . . The injury Plaintiff allegedly suffered is the primary and direct result of HUD's decisions, not the 'determinative or coercive effect' of Greystone on HUD." (Reply at 5.)

The thrust of Greystone's standing argument is that Plaintiff lacks standing to sue because HUD's waiver decision was a superseding cause of Plaintiff's injuries. (Reply at 5.) However, the superseding cause theory may be used to deny standing only on a finding that "even if the challenged conduct were held unlawful, the same injury might continue to flow from an independent cause." Charles Alan Wright et al., 13 Federal Practice and Procedure § 3531.5 (2007 Supp.). In this case, the Complaint does not plead facts showing that Plaintiff would have suffered the same injury if the alleged misconduct by Greystone had not occurred. There is no allegation that HUD would have granted a waiver absent Defendants' improper request for a waiver. Nor is there an allegation that the mortgage would have been refinanced absent Defendants' improper request for a waiver.

Moreover, Plaintiff has alleged that Defendants engaged in improper conduct involving an asset in which Plaintiff had an interest. Defendants' conduct is alleged to have caused or contributed to Plaintiff's injury. These allegations are sufficient to show that Plaintiff's injuries are fairly traceable to Defendants' conduct. Therefore, the Court concludes that Plaintiff's standing to assert its claims against Defendants is not defeated by the fact that HUD's decision contributed to its injury. *See* Wright et al., *supra*, § 3531.5.[5]

**B.      Failure to State Claims for Breach of Contract.**

**1.      Privity.**

Greystone argues that Counts II and IV of the Complaint must be dismissed because Merrill has not properly alleged that it is a third-party beneficiary to the contracts at issue. (Mot. at 14-16.)

---

[5] Greystone also argues that Plaintiff lacks standing to sue in its individual capacity due to the derivative nature of its claims. (Mot. at 10-13.) This argument fails with respect to Merrill's breach of contract claims against Greystone because Merrill asserts those claims as an intended third-party beneficiary of those contracts, not as a shareholder of the REMICs. (*See* Compl. Counts II and IV.) Because Merrill's equitable claims against Greystone are asserted as alternatives to those legal claims, the Court rejects this argument as to the equitable claims as well.

Greystone also argues that Count III of the Complaint must be dismissed because the REMICs lack third-party beneficiary status to assert claims against Greystone for breaching the Servicing and Guaranty Agreements between Reilly/Greystone and Ginnie Mae. (Greystone Mot. at 16-17.)

For a plaintiff to recover for breach of contract as a third-party beneficiary, it must show (1) the contracting parties intended to secure a benefit to the plaintiff and (2) the contracting parties entered into the contract directly for the plaintiff's benefit. *See Stine v. Stewart*, 80 S.W.3d 596, 589 (Tex. 2002). In determining whether a third party can enforce a contract, the intention of the contracting parties is controlling. *See MCI Telecomms. Corp. v. Texas Utils. Elec. Co.*, 995 S.W.2d 647, 651 (Tex. 1999). "A court will not create a third-party beneficiary contract by implication." *Id.* Rather, an agreement must clearly and fully express an intent to confer a direct benefit to the third party. *See id.* "A third party does not have a right to enforce the contract if [it] received only an incidental benefit." *Id.* To determine the parties' intent, courts must examine the entire agreement and give effect to all the contract's provisions so that none are rendered meaningless. *See Stine*, 80 S.W.3d at 589. "Consequently, a presumption exists that parties contracted for themselves unless it 'clearly appears' that they intended a third party to benefit from the contract." *MCI*, 995 S.W.2d at 651. However, a plaintiff need only plead, not prove, its allegations in order to survive a motion to dismiss for failure to state a claim. *See* Fed. R. Civ. P. 8(a).

Greystone argues that neither of the two contracts at issue "creates any direct, intended duty or benefit to [Merrill] individually."[6] Greystone also maintains that the Servicing and Guaranty Agreement was not entered into for the benefit of the REMICs. (Mot. at 14-17.) Greystone criticizes

---

[6] The Administration Contract was entered into between Reilly/Greystone and the REMICs. The Servicing and Guaranty Agreement was entered into between Reilly/Greystone and Ginnie Mae.

Plaintiff for failing to attach the alleged contracts at issue and for failing to identify any specific language demonstrating the Parties' intent to confer third-party beneficiary status on Merrill or the REMICs. (Mot. at 15-16.) At most, Greystone argues, Plaintiff can only claim some sort of incidental benefit, which is not enough to confer third-party beneficiary status.

The issue at this stage of the litigation is whether Merrill has pled any facts that may support its claims that Merrill and the REMICs are third-party beneficiaries to the contracts at issue. With respect to Count II, Merrill has pled that the "Administration Contract in substantial part, including the provisions therein governing loan servicing and security administration, was entered into for the benefit of initial and subsequent purchasers and owners of interest in the REMICs." (Compl. ¶ 33; *see id.* ¶ 36.) Merrill also alleges its status as a purchaser and owner of interest in the REMICs. (Compl. ¶ 18.) Merrill notes that prepayment restrictions like the Prepayment Provision here are intended to, and do in fact, serve as a significant inducement to persons acquiring interests in securities/the REMICs. (Compl. ¶¶ 12, 32.) Merrill goes on to plead that it did rely on that provision and the Administration Contract when it purchased the IO Strips. (Compl. ¶ 33.)

Likewise, with respect to Count IV concerning the Guaranty and Servicing Agreements, Merrill alleges that Greystone was "obligated to service the Loan and administer the Security, and to respond to any related delinquency or default, in good faith and in accordance with accepted mortgage lending and servicing practices, ethics, and standards." (Compl. ¶ 34.) Merrill alleges that Greystone and Ginnie Mae entered into the Guaranty and Servicing Agreements "for the benefit of . . . purchasers and owners of interest in the REMICs." (Compl. ¶ 35.)

Finally, with respect to Count III, which relates to the REMICs' status as third-party beneficiaries, Merrill pleads that the REMICs' third-party beneficiary claim arises from the contract

between Reilly/Greystone and Ginnie Mae pursuant to which Greystone was "obligated to service the Loan and administer the Security, and to respond to any related delinquency or default, in good faith and in accordance with accepted mortgage lending and servicing practices, ethics, and standards." (Compl. ¶ 34.) Merrill alleges that Greystone and Ginnie Mae entered into the Guaranty and Servicing Agreements "for the benefit of . . . purchasers and owners of interest in the REMICs." (Compl. ¶ 35.) Merrill further states that [t]he REMICs, as persons owning or having an interest in the Security, were intended beneficiaries of the contracts between Greystone and Ginnie Mae . . ." (Compl. ¶ 61.)

Contrary to Greystone's assertion, Merrill is not required at the pleading stage to attach the contract and/or identify specific contract language demonstrating the Parties' intent to confer third-party beneficiary status on Merrill or the REMICs. *See In re Dann Marine Towing, LC,* Civ. A. No. 01-3044, 2004 WL 744881, at *6 (E.D. La. Apr. 6, 2004). In fact, it is Greystone's burden to establish that Merrill cannot prove any set of facts in support of its claim that would entitle it to relief. *See Leffall v. Dallas Indep. Sch. Dist.*, 28 F.3d 521, 524 (5th Cir. 1994). Moreover, the Court must accept all well-pleaded factual allegations in Plaintiff's complaint as true. *See Campbell v. City of San Antonio*, 43 F.3d 973, 975 (5th Cir. 1995).

At this early stage of the litigation, the Court cannot determine the Parties' intent as a matter of law without a copy of the contracts, which neither party has provided to the Court. Thus, because the contracts are not before the Court in connection with the instant motion, the Court is unable to conclude that Merrill cannot prove any set of facts, consistent with the allegations set forth above, that would entitle Merrill or the REMICs to relief. Greystone has not carried its burden of demonstrating

as a matter of law that the contractual language and/or the parties' intent was that Merrill and the REMICs were not third-party beneficiaries to these contracts.

## 2. Failure to Plead Breach.

Greystone also argues that all Plaintiff's beach of contract claims should be dismissed because Plaintiff has failed to plead any specific actionable breach of any contract by Greystone. (Mot. at 17.) Plaintiff responds by citing to the Complaint, which sets forth the relevant promises made by Greystone in the Administration Contract; specifically, that Greystone promised to "service the Loan and administer the Security, and respond to any missed payments by South Side, in good faith and in accordance with accepted mortgage lending and servicing practices, ethics, and standards." (Compl. ¶ 31.) Greystone also promised "to not engage in transactions where its interests conflicted with the interests of the owners of the Security." (Compl. ¶ 31.)

The Complaint goes on to describe numerous examples of conduct by Greystone that breach the terms of the Administration Contract. For example, Merrill alleges that "Greystone's interests in issuing a new security conflicted with the interests of the owners of the Security [and] Greystone terminated the Security to further its interests over those of the owners of the Security." (Compl. ¶ 42.) Merrill further alleges that Greystone "ignor[ed] the rights and interests of the owners of the Security [and] took the actions alleged [in the Complaint] so that it could issue a new security at a substantial profit of approximately $6 million." (Compl. ¶ 42.) The Complaint also alleges that Greystone terminated the Security with full knowledge that the prepayment of the Loan or termination of the Security would have a material adverse impact on the REMICs. (Compl. ¶ 39.) Merrill pleads that Greystone "caused the Security to be terminated without legitimate need or justification and without considering or undertaking options to termination that would have protected the interests of

the Security holder." (Compl. ¶ 41.) Merrill then sets forth a detailed list of actions taken by Greystone that it alleges constitute breaches of the Administration Contract. (Compl. ¶ 50.)

With respect to the Servicing and Guaranty Agreement, the Complaint sets forth the relevant promises made by Greystone therein; specifically, that Greystone promised to "service the Loan and administer the Security, and to respond to any related delinquency or default, in good faith and in accordance with accepted mortgage lending and servicing practices, ethics, and standards." (Compl. ¶ 34.) Merrill then sets forth in its Complaint a detailed list of actions taken by Greystone that it believes constitute breaches of the Servicing and Guaranty Agreements. (Compl. ¶ 60, 65.)

Greystone does not rebut the existence of these allegations or Merrill's ability to state a claim for breach of the relevant contracts at issue. Therefore, the Court concludes that Plaintiff has alleged specific conduct that may constitute breach of both the Administration Contract and the Servicing and Guaranty Agreements.

**C.    Failure to State a Claim for Equitable Relief (*Greystone*).**

Greystone argues that Count X of Plaintiff's Complaint entitled "Equitable Relief," is really a non-actionable claim for restitution to prevent unjust enrichment. (Mot. at 18.) Greystone contends that Plaintiff has failed to plead the elements of unjust enrichment, specifically, the fact that it conferred any benefit on Greystone or that Greystone obtained a benefit from Plaintiff by perpetrating a fraud on Plaintiff. (Mot. at 18-19.)

Greystone also argues that Count VIII of Plaintiff's Complaint entitled "Money Had and Received" should be dismissed because Plaintiff "cannot establish that Greystone holds any money that in good conscience belongs to Plaintiff." (Mot. at 20.) It argues that Plaintiff knew the risks of investing in the REMICs and cannot complain now through this equitable claim for loss-of-the-

18

bargain benefits. (Mot. at 20.) Greystone further argues that Plaintiff has not pled that Greystone obtained a benefit from Plaintiff by fraud, duress, or by taking undue advantage of another. It argues that Plaintiff has not alleged that Greystone took advantage of Plaintiff or the REMICs, or that Plaintiff conferred any benefit on Greystone. (Reply at 10.)

Plaintiff responds by arguing that Greystone mischaracterizes the basis for its claim for equitable relief by treating it as a claim for restitution at law arising from unjust enrichment in the quasi-contractual (*quantum meruit*) sense. Rather, Count X is what it says it is: a petition for equitable relief in the form of a constructive trust, an equitable accounting, or other related relief. Plaintiff explains that it is, in part, the equitable counterpart to Count VIII "Money Had and Received." (Resp. at 20.) It is also an alternate pleading to Counts I-IX to provide a remedy if there cannot be a full, adequate and complete remedy at law. Plaintiff goes on to explain that Count X states a claim for alternate forms of equitable relief, including a constructive trust over funds in the possession of Defendants that, in good conscience, belong to the REMICs. Alternatively, Plaintiff seeks an equitable accounting of profits unjustly earned by Defendants. According to Plaintiff, Count X is a separate bill or petition in equity - it is not a quasi-contract claim for restitution as a remedy for breach of an implied contract.

Unjust enrichment is not a distinct independent cause of action, but a theory of recovery. *See Mowbray v. Avery*, 76 S.W.3d 663, 679 (Tex. App. - Corpus Christi 2002, pet. denied). The doctrine of unjust enrichment applies the principles of equitable restitution to a variety of disputes and is based on the principle that one who wrongfully secured a benefit or passively received one that would be unjust for him to retain, ought to make restitution. *See Friberg-Cooper Water Supply Corp. v. Elledge*, 197 S.W.3d 826, 832 (Tex. App. - Fort Worth 2006), *rev'd on other grounds*, No. 06-

0677, 2007 WL 2404872 (Tex. Aug. 24, 2007); *Villarreal v. Grant Geophysical, Inc.*, 136 S.W.3d 265, 270 (Tex. App. - San Antonio 2004, pet. denied); *City of Harker Heights, Texas v. Sun Meadows Land, Ltd.*, 830 S.W.2d 313, 318 (Tex. App. - Austin 2002, no pet.) However, unjust enrichment is not a proper remedy "merely because it might appear expedient or generally fair that some recompense be afforded for an unfortunate loss to the claimant, or because the benefits to the person sought to be charged amount to a windfall." *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 42 (Tex. 1992).

For example, a party will be able to recover under the doctrine of unjust enrichment where a claim for *quantum meruit* has been established; where a plaintiff has established a promise implied by law to pay for beneficial services rendered and knowingly accepted. *See, e.g., Allen v. Berrey*, 645 S.W.2d 550, 553 (Tex. App. - San Antonio 1982, writ ref'd n.r.e.). However, if the parties contracted for the rendition of services, the contract itself must govern plaintiff's compensation. *See, e.g., City of Harker Heights*, 830 S.W.2d at 318. In other words, *quantum meruit* involves the specific situation where the plaintiff has performed services that benefitted the defendant. *See id.* "Recovery in *quantum meruit* will be had when nonpayment for the services rendered would result in an unjust enrichment to the party benefitted by the work." *Id.*

Likewise, "[a] party may recover under the unjust enrichment theory when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage." *See Heldenfels*, 832 S.W.2d at 41. A party may also recovery under the theory of unjust enrichment when there has been a breach of trust or fiduciary duty. *See Newby v. Enron Corp.*, 188 F. Supp. 2d 684, 702-03 (S.D. Tex. 2002).

Another basis for recovering under the theory of unjust enrichment is when a claim for "money had and received" has been established - where a plaintiff has established that the defendant obtained money that in equity and good conscience belongs to another. *See Friberg-Cooper*, 197 S.W.3d at 831-32. An action for money had and received may be founded upon an express agreement or one implied in fact, but it is not dependent upon either. *See City of Harker Heights*, 830 S.W.2d at 317. An action for money had and received is "'less restricted and fettered by technical rules and formalities than any other form of action. It aims at the abstract justice of the case, and looks solely to the inquiry, whether the defendant holds money, which . . . belongs to the plaintiff.'" *Friberg-Cooper*, 197 S.W.3d at 832; *City of Harker Heights*, 830 S.W.2d at 317 (citation omitted).

Whereas unjust enrichment is a theory of recovery, restitution is a measure of damages. *See City of Harker Heights*, 830 S.W.2d at 317. To be entitled to restitution under a theory of unjust enrichment, the plaintiff must show that the party sought to be charged had wrongfully secured a benefit or had passively received one that would be unconscionable for the party to retain. *See Villarreal*, 136 S.W.3d at 270. Unjust enrichment is based on the equitable principle that one who receives benefits unjustly should make restitution for those benefits. *See id.*

Equity has developed several devices to award restitution, including the constructive trust and the equitable accounting of profits. *See Newby*, 188 F. Supp. 2d at 702; *City of Harker Heights*, 830 S.W.2d at 713. But behind all the devices lay the very general principle of avoiding unjust enrichment. *See City of Harker Heights*, 830 S.W.2d at 317.

Although it is difficult to discern the precise basis for Greystone's argument for dismissal, it appears to be arguing that Plaintiff has failed to plead a claim for unjust enrichment based on *quantum*

*meruit*, or quasi-contract. Greystone also argues that Plaintiff has failed to plead a claim for unjust enrichment based on fraud or duress.

First, contrary to Greystone's argument, Plaintiff has not pled a claim for unjust enrichment based on *quantum meruit*. Rather, Plaintiff has pled a cause of action for "money had and received," and Plaintiff bases its claim of equitable relief on the theories that Defendants "asserted undue and improper influence on others" and "breached their respective duties owed to the REMICs . . ." (Compl. ¶¶ 88-91, 98.)

Furthermore, a review of the Complaint establishes that Plaintiff has pled sufficient facts to state a claim for equitable relief based on the theories that Defendants asserted undue and improper influence" and "breached their respective duties owned to the REMICs." Plaintiffs have alleged that Greystone, as the servicer of the mortgage loan and the administrator of the Security, was in a position of confidence and trust with respect to the REMICs, as owners of the Security. Plaintiff has alleged that Greystone breached that trust when it made false and misleading statements to HUD. It also alleges that it breached its duty of loyalty when it wrongly terminated the Security. Plaintiff has further asserted that Greystone personally profited from this inequitable conduct in breach of its duty of loyalty.

### III. SOUTH SIDE'S RULE 12(b)(6) MOTION TO DISMISS

South Side moves to dismiss for failure to state a claim Plaintiff's breach of contract claims, its tortious interference claim, its claim for money had and received, its claim for negligent misrepresentation, and its claim for equitable relief.[7]

---

[7] The Local Rules of this Court limit a party's briefing to 25 pages. (Local Rule 7.2(c).) In an effort to circumvent this rule, South Side has abused the use of footnotes. Nearly every sentence of its brief is supplemented with a footnote, for a total of 65 footnotes - each being single-spaced, ten-point font, and many of which are 3/4 of a page in length. In some cases, a footnote will comprise an entire page. Much of South Side's substantive argument

**A.      Failure to State Claims for Breach of Contract.**

      **1.      Breach of Loan Agreement (Count V).**

Count V of Plaintiff's Complaint is a claim by the REMICs against South Side for breach of the Loan Agreement.  Plaintiff alleges in its Complaint that South Side breached the Loan agreement between South Side and Reilly – of which the REMICs were third-party beneficiaries – by circumventing the Prepayment Provision, by obtaining HUD approval for prepayment, by prepaying and refinancing the Loan, by failing to act in good faith, and by scheming with Greystone to accomplish these acts.

South Side moves to dismiss this claim on several bases: (1) Plaintiff has failed to establish its third-party beneficiary status; (2) Plaintiff has failed to allege whether the contract was written or oral; (3) Plaintiff has not alleged damages proximately caused by a breach of contract; and (4) Plaintiff has not adequately alleged a duty of good faith and fair dealing.

       a.      *REMICs' Third-party Beneficiary Status*
             *Under the Loan Agreement Between South Side and Reilly.*

South Side argues that Merrill has not established that the REMICs were third-party beneficiaries to the Loan Agreement.  (Mot.  at 14-17.)  South Side maintains that "Plaintiff pleads only in a conclusory fashion that it is an 'intended beneficiary' of South Side's loan from a third party."  (Mot.  at 15.)  South Side notes that Merrill did not attach the Loan Agreement to the Complaint and does not identify any contract language or provision that demonstrates the parties' intent to confer third-party beneficiary status on the REMICs.

---

is contained in these footnotes.  This use of footnotes to avoid compliance with the page limitation will not be tolerated in future briefing.

The issue at this stage of the litigation is whether Merrill has pled any facts that may support its claim that the REMICs are third-party beneficiaries to the Loan Agreement between Reilly and South Side. Although the allegations in the Complaint are not detailed, the allegations are sufficient to put South Side on notice that the REMICs' third-party beneficiary claim arises from the contract between South Side and Reilly that contained a Prepayment Provision that was breached by South Side. Merrill further alleges that the "Prepayment Provision was agreed to, and included in the Loan, in order to attract and induce . . . investors [such as the REMICs] to purchase the Security and to thereby fund the Loan and thus was included in the Loan directly for the benefit of initial and subsequent purchasers and owners of the Security. . ." (Compl. ¶ 16.) Because the Loan Agreement is not before the Court in connection with the instant motion,[8] the Court is unable to conclude that Merrill can prove no set of facts, consistent with the allegations, that would entitle the REMICs to relief.[9]

---

[8] South Side erroneously argues that the Federal Rules of Civil Procedure require Plaintiff to either plead verbatim the exact contract terms at issue or attach the contract as an exhibit to its Complaint. Neither the federal rule nor the form cited by South Side state that a plaintiff must plead the contract terms verbatim or attach the contract as an exhibit to its complaint. Likewise, federal courts have held that a plaintiff need not plead the contract terms verbatim or attach the contract as an exhibit to state a claim for breach of contract based on third-party beneficiary status. *See, e.g., In re Dann Marine Towing, LC,* Civ. A. No. 01-3044, 2004 WL 744881, at *6 (E.D. La. Apr. 6, 2004).

[9] The Court rejects South Side's argument that Plaintiff's breach of contract claim must be dismissed because Plaintiff has failed to identify in its Complaint whether the Loan Agreement was written or oral. (Mot. at 18.) South Side has not cited any cases demonstrating that a plaintiff is required to plead the oral or written nature of a contract. In the cases South Side cites, the very existence of the contracts are in dispute. Contrary to this case, the complaints in those cases assert claims for breach of contract without any allegation about the existence of the contract - including, for example, when the contract was made, the terms of the contract, whether the contract was oral or written, and what action the defendants took to breach those terms.

Likewise, South Side's conclusory statement that Plaintiff has "fail[ed] to allege that the damages it 'suffered' were proximately caused by a breach of the contract" fails. (Mot. at 18.) Merrill has alleged repeatedly that South Side's wrongful conduct, including its breach of the Loan Agreement, proximately caused Merrill and the REMICs to suffer losses of more than $12 million. (Compl. ¶¶ 46-47, 72.)

b.       *Breach of Duty of Good Faith.*

South Side argues that Plaintiff's claim for breach of the Loan Agreement fails to the extent it is based on South Side's breach of the duty of good faith and fair dealing.  South Side argues that the duty of good faith and fair dealing arises only by express contractual agreement or when there is a special relationship between the parties, neither of which exists in this case.  (Mot. at 19.)  Merrill responds by explaining that a duty of good faith is imposed on the parties to the Loan Agreement pursuant to § 1.304 of the Texas Business & Commerce Code (Uniform Commercial Code), which applies to negotiable instruments such as the Loan Agreement.  South Side does not dispute this argument.

Plaintiff has alleged in Paragraph 10 of the Complaint that the Loan was documented by a negotiable instrument.  (Compl.  ¶ 10.)  Negotiable instruments are governed by the Uniform Commercial Code, which imposes on every contract within its purview an obligation of good faith in its performance and enforcement.  *See* Tex.  Bus. & Comm.  Code § 1.304 (Vernon Supp.  2005.)  Therefore, the Court concludes based on the pleadings that the parties to the Loan Agreement were bound to perform their obligations thereunder in good faith.

## 2.       Breach of Contract Between REMICs and South Side (Count VI).

South Side contends that Count VI of Plaintiff's Complaint should be dismissed for the same reasons Count V should be dismissed and because the allegations fail to establish that Plaintiff was a party to the contract.

In Count VI of the Complaint, Plaintiff states that "South Side is a party to a contract with the REMICs."  (Compl.  ¶ 76.)  This alleged contract is described in the Complaint as an agreement whereby South Side would include a Prepayment Provision in the Loan Agreement in exchange for

Merrill's/the REMICs' commitment to fund the Loan. (Compl. ¶¶ 17, 76.) Plaintiff further alleges that South Side breached the contract by circumventing the prepayment provision, by obtaining HUD approval, and by prepaying and refinancing the Loan. (Compl. ¶ 77.) Merrill pleads that the REMICs suffered the loss of the Security and the interest payments due to them under the Loan, to the tune of more than $12 million as a direct and foreseeable result of the wrongful conduct.

Based on these allegations, the Court concludes that Merrill sufficiently pled the elements of a breach of contract claim for breach of an agreement between South Side and the REMICs.

**B.  Pleading Fraud with Particularity.**

In addition to its breach of contract claims, Merrill has asserted claims against South Side for tortious interference with a contract (Count VII), money had and received (Count VIII), negligent misrepresentation (Count IX); and for equitable relief (Count X). South Side claims that these claims must be dismissed because they sound in fraud and have not been pled with the particularity required by Rule 9(b).

Rule 9(b) states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). The Fifth Circuit has declared that "Rule 9(b)'s stringent pleading requirements should not be extended to causes of action not enumerated therein," *American Realty Trust, Inc. v. Hamilton Lane Advisors, Inc.*, 115 Fed. Appx. 662, 668 (5th Cir. 2004) (rejecting application of heightened pleading standard to claim of negligent misrepresentation). "When both fraud and non-fraud claims are alleged, Rule 9(b) pleading requirements sometimes apply to both, but compliance with Rule 9(b) is required only when the non-fraud claims are 'so intertwined' with the fraud averments that it is not possible to describe a simple redaction to separate the two." *Kennard v. Indianapolis Life Ins. Co.,* 420 F.

Supp. 2d 601, 609 (N.D. Tex. 2006) (Fish, J.). Here, Plaintiff enumerates three causes of action, none of which is fraud *eo nomine*. With no allegations "intertwined" with those of fraud, the court finds that Rule 9(b) should not be applied to Plaintiff's claims for negligent misrepresentation, tortious interference, or money had and received. *See Kennard,* 420 F. Supp. 2d at 609 (because no fraud claim was pled and the allegations behind DTPA and Texas Insurance Code claims were not "intertwined" with any fraud claim, Rule 9(b) did not apply). Accordingly, South Side's motion to dismiss on this ground is denied.[10]

## C.   **Tortious Interference.**

In Count VII of Plaintiff's Complaint, Merrill asserts a claim for tortious interference against South Side for willfully inducing Greystone to breach its Administration Contract with the owners of the Security. That agreement required Greystone to work in good faith to service the Loan, administer the Security, and respond to missed payments by South Side. The Administration Contract also incorporated the Prepayment Provision, which prohibited South Side from prepaying the mortgage. (Compl. ¶¶ 31-32.) South Side argues (in a footnote) that Plaintiff fails to state a claim for tortious interference on the grounds that the claim defeats itself and Merrill has failed to plead the element of willfulness.

First, South Side argues that Plaintiff's Complaint alleges that South Side tortiously interfered with its own Loan Agreement and therefore, Plaintiff cannot recover under this claim as a matter of law. However, South Side mischaracterizes Plaintiff's tortious interference claim. The

---

[10] South Side argues that Plaintiff's information-and-belief allegations must be dismissed because Plaintiff failed to provide the factual bases for those allegations as required by Rule 9(b). A plaintiff may rely upon information and belief to plead fraud in compliance with Rule 9(b) when "the facts relating to the alleged fraud are peculiarly within the perpetrator's knowledge." *U.S. ex rel. Doe v. Dow Chemical Co.,* 343 F.3d 325, 330 (5th Cir. 2003). However, because the Court has held, *supra*, that Plaintiff's negligent misrepresentation claim is not governed by Rule 9(b), this issue is moot.

Complaint specifically states that South Side tortiously interfered with the Administration Agreement between Greystone and the REMICs. (Compl. ¶ 84.) Merrill alleges that South Side "induced Greystone to terminate the Security . . . in breach of Greystone's contractual obligation to administer the Security in accordance with industry standards and ethics and not to engage in transactions wherein Greystone['s] interests conflicted with that of the owners of the Security." (Compl. ¶ 84.) Merrill alleges that South Side and Greystone conspired to circumvent the Prepayment Provision and refinance the Loan, thereby earning them a substantial profit. (Compl. ¶¶ 21-22.)[11]

South Side also argues that Plaintiff has failed to allege the element of "willfulness," which is required to sustain a claim for tortious interference. Plaintiff has alleged that South Side and Greystone conspired to circumvent the Prepayment Provision of the Administration Contract and refinance the Loan, thereby earning them a substantial profit. (Compl. ¶¶ 21-22.) Merrill further alleges that South Side knowingly and willfully induced Greystone to breach its contract with Merrill/the REMICs. (Compl. ¶ 84.) These allegations are sufficient to plead the element of willfulness in a claim for tortious interference. *See, e.g., Levine v. First Nat'l Bank of Eagle Pass*, 706 S.W.2d 749, 751 (Tex. App. - San Antonio 1986), *rev'd on other grounds*, 721 S.W.2d 287 (Tex. 1986) (plaintiff's allegation that defendant's actions were "willful and malicious and intentionally done to harm and injure plaintiff's credit standing was sufficient to satisfy element of willfulness in a claim for tortious interference.)

---

[11] To the extent Merrill is arguing that South Side tortiously interfered with the "agreement between Greystone and Ginnie Mae," (Compl. ¶ 85) Merrill's claim must fail because it was not a contracting party to that agreement. *See Holloway v. Skinner*, 898 S.W.2d 793, 794-95 (Tex. 1995) ("Texas jurisprudence has long recognized that a party to a contract has a cause of action for tortious interference against any third person (a stranger to the contract) who wrongly induces another contracting party to breach the contract.")

**D.** **Money Had and Received.**

Plaintiff has alleged in its Complaint that "South Side received and is holding money, in the form of rental payments from tenants," that would have been paid to the REMICs had South Side not engaged in wrongful conduct. (Compl. ¶ 90.) South Side argues that Plaintiff's claim for money had and received should be dismissed because Plaintiff has not pled that South Side received money that belonged to Plaintiff. South Side also argues that Plaintiff has failed to allege "why South Side is/or is required to, hold rental payments for Plaintiff's benefit." (Mot. at 22.)

A claim for "money had and received" has been established where a plaintiff has demonstrated that the defendant obtained money that in equity and good conscience belongs to another. *See Nivens v. City of League City,* – S.W.3d –, No. 01-05-00335, 2007 WL 1018306 (Tex. App. - Houston [1st Dist.] Apr. 5, 2007, no pet. h.); *Hunt v. Baldwin,* 68 S.W.3d 117, 132 (Tex. App. - Houston [1st Dist.] 2001, no pet.). "The question, in an action for money had and received, is to which party does the money, in equity, justice, and law, belong. All plaintiff need show is that defendant holds money which in equity and good conscience belongs to him" *Staats v. Miller*, 243 S.W.2d 686, 687 (Tex. 1951.) An action for money had and received is "less restricted and fettered by technical rules and formalities than any other form of action. It aims at the abstract justice of the case, and looks solely to the inquiry, whether the defendant holds money, which belongs to the plaintiff." *Id.*

Plaintiff has alleged that South Side holds rental payments that in equity and good conscience belong to the REMICs. (Compl. ¶ 90.) In other words, the REMICs are entitled to the original interest payments agreed-upon in the various contracts, and South Side should not be able to retain the difference between the original interest rate amount and the lower interest rate amount that was

wrongfully obtained by South Side and Greystone though their refinancing effort; that difference belongs to the REMICs to make them whole. This allegation is sufficient to state a claim for money had and received.

South Side also presents an argument that is nothing more than a legal statement and a conclusion that "prospective loss of benefit-of-the-bargain damages do not constitute injuries that are recoverable in an equitable claim for money had and received." Nowhere does South Side provide any analysis or explanation as to why this statement of the law is applicable to this case. (Mot. at 22.)

South Side also asserts that "Plaintiff pleads itself out of court" because it seeks to plead a cause of action for money had and received and a claim for breach of an express contract. South Side argues that recovery for money had and received is unavailable where Plaintiff alleges an express contract, and Plaintiff has failed to specifically plead the cause of action for money had and received in the alternative.

South Side has not cited any authority for the proposition that a claimant must use the magic language, "in the alternative," to avoid dismissal of inconsistent claims. In fact, Rule 8 of the Federal Rules of Civil Procedure states that "[a] party may . . . state as many separate claims or defenses as the party has regardless of consistency . . . " Therefore, dismissal of Plaintiff's claim on this basis is inappropriate. *See* Fed. R. Civ. P. 8.

E.      **Negligent Misrepresentation.**

Plaintiff has asserted a claim for negligent misrepresentation against South Side for making false statements about the financial stability of the Property, specifically including the current and

expected future occupancy rates, improvements in commercial space rentals, the commitment of owners and investors of the property, and the existence of financial reserves. (Compl. ¶ 19.)

South Side argues that Plaintiff's negligent misrepresentation claim should be dismissed because (1) Plaintiff's claim is barred by the two-year statute of limitations, (2) Plaintiff's claim is barred by the economic loss rule, and (3) Plaintiff's economic damages are not recoverable as a matter of law.[12]

### 1.     Statute of Limitations.

South Side argues that Plaintiff's negligent misrepresentation claim is barred by Texas' two-year statute of limitations because the alleged misrepresentation occurred in 2002-03 and the Complaint was not filed until March 2006. Plaintiff responds that the discovery rule applies in this case and tolls the limitations period to the time Plaintiff discovered the nature of the injury, which in this case was July 2004 - when the Security was terminated. South Side does not reply to this argument.

A claim for negligent misrepresentation is subject to a two-year statute of limitations, which runs from the date of the alleged misrepresentation. *See HECI Exploration Co. v. Neel,* 982 S.W.2d 881, 885 (Tex. 1998); Tex. Civ. Prac. & Rem.Code Ann. § 16.003 (Vernon 1986). However, the discovery rule tolls this limitations period and defers actual accrual of the cause of action until the injured party discovers, or by using reasonable care and diligence should have discovered, the nature of the injury. *See, e.g., HECI Exploration Co.,* 982 S.W.2d at 886. The discovery rule applies to a negligent misrepresentation claim only when the injury is inherently undiscoverable and the

---

[12]  South Side also argues that Plaintiff's negligent misrepresentation claim should be dismissed because Plaintiff improperly pleads on information and belief and because Plaintiff fails to plead its claim with particularity. Those arguments have been discussed and rejected, *supra*.

evidence of the injury is objectively verifiable. *See id.; Armstrong v. American Home Shield Corp.*, 333 F.3d 566, 570 (5th Cir. 2003). An injury is inherently undiscoverable if it is of a type not generally discoverable by the exercise of reasonable diligence. *See id.*

South Side does not rebut Merrill's argument that its injury was inherently undiscoverable. Moreover, the Court is unable to conclude from the Complaint that Merrill cannot prove that the injury was inherently undiscoverable. Therefore, the dismissal of Merrill's negligent misrepresentation claim on this basis is inappropriate.

    2.    **Economic Loss Rule.**

South Side asserts in a conclusory fashion that Merrill's negligent misrepresentation claim should be dismissed because Merrill's "cause of action is barred by the economic loss rule." (Mot. at 24.) "The economic loss rule precludes recovery of economic losses in negligence when the loss is the subject matter of a contract between the parties." *Coastal Conduit & Ditching, Inc. v. Noram Energy Corp.*, 29 S.W.3d 282, 285 (Tex. App. - Houston [14th Dist.] 2000, no pet.). If the "injury is only the economic loss to the subject of a contract itself, the action sounds in contract alone." *Tarrant County Hosp. Dist. v. GE Automation Servs.,* 156 S.W.3d 885, 895 (Tex. App .- Fort Worth 2005, no pet.). If the "defendant's conduct gives rise to liability independent of a contract's existence, the plaintiff's claim may sound in tort." *Bank of Am. v. Hubler*, 211 S.W.3d 859, 863 (Tex. App. - Waco 2003, pet. granted, judgm't vacated, remanded by agr.); *Dennis Jewelry Co. v. Sonitrol Mgmt. Corp.*, No. 04-01-00279-CV, 2003 WL 179618 at *3 (Tex. App. - San Antonio 2003, no pet.). The "nature of the injury suffered determines whether a cause of action in tort exists." *Tarrant County Hosp. Dist.*, 156 S.W.3d at 895. Courts look to the "substance of the cause of action, not the manner in which it was plead, to determine the type of action that is brought." *Id.*

South Side has failed to explain how the economic loss rule applies to Merrill's negligent misrepresentation claim. It does not argue that Merrill cannot prove that it suffered damages independent of those sustained as a result of South Side's breach of the Loan. Therefore, the Court is unable at this stage of the litigation to determine based on the Complaint whether the economic loss rule applies to Merrill's negligent misrepresentation claim.[13]

## CONCLUSION

Therefore, for the reasons stated herein, Greystone's Motion to Dismiss Plaintiff's Complaint is hereby DENIED and South Side's Motion to Dismiss Plaintiff's Complaint is hereby DENIED.

It is SO ORDERED, this 18th day of September 2007.

_Jorge A. Solis_
JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE

---

[13] The Court finds no merit to South Side's arguments that (1) "Plaintiff's alleged damages (the deprivation of 'economic advantage') are not recoverable as a matter of law" and (2) Plaintiff improperly pled that "South Side's conduct, not the information provided, caused Plaintiff's damages." (Mot. at 24-25.) First, South Side does not identify any language in the Complaint stating that Merrill suffered "the deprivation of economic advantage." Second, the Court does not read any such language in Merrill's negligent misprestration claim. (Compl. ¶¶ 92-95.) Third, South Side does not explain how the case upon which it relies (*Federal Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439 (Tex. 1991)) is relevant to its argument or the case at bar generally. The Court also rejects South Side's spurious argument that Merrill's negligent misrepresentation claim fails for lack of causation because the Complaint states that South Side's *conduct*, as opposed to the information provided, caused the damages. (Mot. at 25.) South Side has not identified any legal requirement that Plaintiff plead this way; probably because such a requirement would be overly technical, does not exist, and would serve no legitimate purpose.