IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MERRILL LYNCH, PIERCE, FENNER & SMITH, P.C., | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 3:06-CV-0575-P |
| GREYSTONE SERVICING CORPORATION, INC. and SOUTH SIDE PLAZA 455 LTD., LLP, | § § § § | |
| Defendants. | § § | |

## <u>MEMORA NDUM OPINION AND ORDER</u>

Now before the Court are the following motions:

1.  Defendant Greystone Serving Corporation, Inc.'s ("Greystone") Motion for Summary Judgment, filed February 17, 2009;

2.  Plaintiff Merrill Lynch, Pierce, Fenner & Smith, P.C.'s ("Merrill") Motion for Partial Summary Judgment, filed February 17, 2009;

3.  Greystone's Motion to Strike Merrill's Summary Judgment Evidence, filed March 16, 2009;

4.  Merrill's Motion to Strike Portions of the Declaration of Robert R. Barolak, filed March 27, 2009; and

5.  Merrill's Motion to Strike Portions of Greystone's Reply Brief in Support of Motion for Summary Judgment, filed April 6, 2009.

After careful consideration of the parties' briefing and the applicable law, the Court hereby

DENIES Merrill's Motion for Partial Summary Judgment.  Greystone's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.  Summary judgment in Greystone's favor is GRANTED on Merrill's claims for breach of an Administration Contract and breach of the Guaranty Agreement.  Summary judgment is DENIED on Merrill's claims for breach of the Servicing Agreement and its remaining claims against Greystone for money had and received and equitable relief.  Each of the parties' Motions to Strike are DENIED as moot, except that Merrill's request to strike an argument that did not appear in Greystone's initial brief in support of summary judgment is GRANTED.

## BACKGROUND

South Side Plaza 455 Ltd., LLP ("South Side") is the owner of a residential rental and commercial real estate property in Dallas, Texas known as South Side on Lamar (the "Property"). (Am. Compl. ¶ 7.)  In June 1999, South Side financed the construction and initial operation of the Property with the proceeds from a $64 million loan (the "Loan") from Reilly Mortgage Group, Inc. ("Reilly").  (*Id*. at ¶ 8.)   The Loan was to mature on July 1, 2042, carried an interest rate of 7.75%, and was secured by a mortgage on the Property.  ( *Id*.)   The United States Department of Housing and Urban Development ("HUD") insured the repayment of the Loan.  (*Id*. at ¶ 9.)

The Loan Agreement contained a provision, pursuant to HUD regulation 24 C.F.R. § 200.87(c), that prohibited South Side from prepaying the Loan in whole or in part prior to May 2012 ("Prepayment Provision").[1]  (*Id*. at ¶ 11.)  However, the Loan Agreement also included an

---

[1] Prepayment restrictions, like the Prepayment Provision here, are common provisions in commercial mortgage-backed securities and are a significant inducement to investors to purchase such securities.  (Am. Compl. ¶ 12.)  Prepayment restrictions insulate the holder of the security against the reinvestment risk of early repayment. (*Id*.)

exception to the Prepayment Provision, pursuant to HUD regulation 24 C.F.R. § 200.87(d), that allowed prepayment in the event that HUD determined that prepayment would avoid a mortgage insurance claim and was in the best interests of the federal government.

In order to obtain funding for the Loan, Reilly issued a security (the "Security") backed by the Loan and guaranteed by the Government National Mortgage Association ("Ginnie Mae" or "GNMA"). (*Id*. at ¶ 14.) Ginnie Mae is a government corporation within HUD established to guarantee mortgage-backed securities, pursuant to 24 C.F.R. Part 320. Mortgage-backed securities, or "MBS", are a type of fixed-income investment. The most common type of MBS is a simple "pass-through" security that represents ownership of an underlying pool of mortgage loans. Investors who own the MBS are entitled to receive collections of interest and principal. In MBS jargon, the payments on the loans are "passed-through" to the investors. However, a small portion of the interest collected is not passed-through. Instead, it is used to cover the expenses of the deal. Thus, an MBS has a "pass-through rate," which is the net rate at which investors receive interest on the balance of the mortgage loans backing the security.

Every MBS has a "servicer." The servicer is the company that collects payments from borrowers and handles the administrative task of aggregating the collected funds and distributing them to investors. Naturally, the servicer receives a fee for its efforts. In most MBS, the fees to the servicer consume all or nearly all of the difference between the face interest rate on the pooled mortgage loans and the pass-through rate on the security. In many cases, the lender that originated the mortgage loans (in this case, Reilly) becomes the servicer for the MBS comprising those loans.

Most MBS are issued or guaranteed by one of three mortgage-related "agencies" or

"government sponsored enterprises:" (1) Ginnie Mae, (2) Fannie Mae, and (3) Freddie Mac.  Each "agency MBS" has the benefit of a credit guarantee from its related agency.  Those guarantees insulate MBS investors from credit risk on the underlying loans.  With respect to Ginnie Mae, the federal government backs Ginnie Mae's guarantees.

Plaintiff Merrill purchased the Security in July 2002, divided the Security into two equal shares, and conveyed the Security to two different trusts organized as Real Estate Mortgage Investment Conduits (the "REMICs").[2]  (*Id*. at ¶ 18.)  According to the Amended Complaint, in late 2002 and early 2003, South Side represented to Merrill that the Property was financially sound.  Merrill then acquired unique interests in the REMICs pursuant to which Merrill was to receive periodic payments of interest only, consisting in part of interest paid on the Loan.  (*Id*. at ¶ 19.)  Merrill alleges that it would not have purchased its interests in the REMICs had South Side not confirmed the Property's financial viability.  (*Id*.)

South Side defaulted on the Loan by missing a payment due on October 1, 2003.  (Def.'s Mot. Summ. J. App. 25 (Martin Decl. ¶ 3.).)  On July 1, 2004, Reilly and Defendant Greystone executed an Assignment Agreement, whereby Greystone assumed all of Reilly's rights and interest in, as well as duties and obligations under, contractual agreements Reilly had entered as the issuer of the Security.  (Def.'s Mot. Summ. J. App. 29 (Assignment Agreement § 2.02).)  The contractual

---

[2]  A REMIC is a mortgage bond that separates mortgage pools into different risk classes and maturities.  Ginnie Mae-REMICs are backed by Ginnie Mae-guaranteed MBS.  Those who wish to be REMIC sponsors must first apply for Ginnie Mae approval, and only then may they form a trust to issue structured Ginnie Mae-guaranteed REMICs.

Merrill brings the instant suit on behalf of itself as well as the two REMICs, from which it has purportedly taken an assignment of the REMICs claims and causes of action.  (Am. Compl. ¶ 1).  For purposes of this Order only, the Court will sometimes refer to Merrill and the REMICs as the same entity.

agreements assigned from Reilly to Greystone included a Guaranty Agreement and Servicing Agreement with Ginnie Mae, which obligated Greystone to work in good faith to service the Loan, administer the Security, and respond to missed payments by South Side.  (Am. Compl. ¶ 34.)  The Guaranty Agreement also granted the issuer the option to purchase, at par, any mortgage that has been in default for a continuous period of ninety days or more.  (Def.'s Mot. Summ. J. App. 61 (Guaranty Agreement § 4.02).)

Par value of a MBS is the face value plus any then-accrued interest.  This is in contrast to the incremental or premium value of a MBS, which is represented by that amount of the MBS' pass-through rate that exceeds the current market interest rates.  For example, if a MBS has a pass-through rate of 6% and the current market interest rates are approximately 5%, then the MBS has a premium value in excess of its par value because investors would presumably be willing to pay more than par value to obtain above market interest rate payments for a time-certain (which is dictated by the borrower's prepayment restrictions) and guaranteed by Ginnie Mae or a similar agency in the event of default.

When it succeeded Reilly as the issuer, Greystone also became a party to the prospectus prepared and distributed by Reilly as marketing for the Security (the "Prospectus").  (Pl's Mot. Partial Summ. J. App. 116-20.) The Prospectus makes numerous disclosures or representations, principle among them are the terms of the Loan's Prepayment Provision, which restricts the borrower's right to voluntarily prepay the Loan, and a provision that restricts the issuer from terminating the Loan prior to the maturity date of the Security without each holder's consent.  (*Id.* at 118, 120.)  The Prospectus also states that pursuant to contractual agreements between the issuer

and GNMA (i.e., the Guaranty Agreement and Servicing Agreement), the issuer will administer the Security and service the underlying Loan "in accordance with the generally accepted practices of the mortgage banking industry." (*Id.* at 118.). Relevant administration and servicing standards are set forth in the GNMA Mortgage-Backed Securities Guide, Ginnie Mae 5500.3, Rev.1 (July 1, 2003) (the "GNMA Guide") and by reference therein, the Federal Housing Administration's Insured Multifamily Mortgage Servicing and Field Office Monitoring Handbook, HUD Document Number 4350.54 (the "HUD Handbook").

According to Merrill, the issuer's (Reilly) representation in the Prospectus that it would administer the Security and service the Loan in accordance with the GNMA Guide constituted an "offer" to do such, which the holder (the REMICs' predecessor in interest) accepted by paying valuable consideration for the purchase of the Security and allowing the issuer to retain monthly payments as compensation for administering the Security and servicing the Loan. Accordingly, Merrill continues, there existed an implied-in-fact "Administration Contract" between the issuer of the Security and the holder which obligates the issuer to administer the Security and service the Loan in accordance with the GNMA Guide. (Am. Compl. ¶ 31.) When Greystone succeeded Reilly as the issuer of the Security, Merrill alleges that Greystone took on Reilly's obligations under the Administration Contract. (*Id.*)

On August 1, 2004, Greystone exercised its right under the Guaranty Agreement to repurchase the Loan. (Def.'s Mot. Summ. J. App. 26 (Martin Decl. ¶ 8).) South Side had been in continuous default on the Loan since October 1, 2003. (*Id.*) The Security was terminated and the holders, including the REMICs, were paid off at par. South Side remained in default until October

2004, when Greystone refinanced the Loan and issued a new MBS backed by the newly refinanced mortgage-secured loan to South Side.  (Am. Compl. ¶ 39; Def.'s Mot. Summ. J. App. 26 (Martin Decl. ¶ 4).)

The graveman of Merrill's claims are that after it purchased its interests in the REMICs, but before South Side went into default, Greystone and South Side conspired to circumvent the Prepayment Provision, refinance the Loan at a lower interest rate, cause HUD to reinsure the refinanced loan, and sell a new security to a new investor at a substantial profit.[3]  (Am. Compl. ¶¶ 21-30.)  These alleged profits (in the amount of $7.2 million) came at the expense of the Security holders, including the REMICs, and Merrill as the owner of interest in the REMICS (in the amount of $12 million).  (*Id.* at ¶¶ 21-28, 44, 47.)  Further, in order to persuade HUD to waive the Prepayment Provision and to complete its scheme with South Side, Merrill insists that Greystone misrepresented to HUD, and convinced HUD, through a variety of acts and statements and omissions, that the financial viability of the Property and South Side's ability to repay the Loan were in jeopardy.  (*Id.* at ¶¶ 25-26.)  Merrill concludes that these actions by Greystone were in contravention of its obligations under the Administration Contract, Guaranty Agreement, and Servicing Agreement.

Merrill brings suit directly against Greystone for breach of the alleged Administration Contract and as a third-party beneficiary for breach of the Guaranty Agreement and Servicing Agreement between Greystone and Ginnie Mae.  Alternatively, should Merrill not be able to recover under its breach of contract claims, it seeks various forms of equitable relief.  Merrill also states a

---

[3] South Side was dismissed as a defendant in this action on October 20, 2008.  (Oct. 20, 2008 Order.)

claim against Greystone for money had and received.

Greystone now moves for summary judgement on all of Merrill's claims.  Merrill opposes summary judgment in Greystone's favor and moves for partial summary judgment in its own favor as to the existence and scope of the duties Greystone allegedly owed to holders of the Security under the Administration Contract, Guaranty Agreement, and Servicing Agreement.

<u>**MOTIONS FOR SUMMARY JUDGMENT**</u>

## I.      LEGAL STANDARD

Summary judgment shall be rendered when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the burden of informing the district court of the basis for its belief that there is an absence of a genuine issue for trial and of identifying those portions of the record that demonstrate such absence.  *See Celotex*, 477 U.S. at 323.  However, all evidence and reasonable inferences to be drawn therefrom must be viewed in the light most favorable to the party opposing the motion.  *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Once the moving party has made an initial showing, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue.  Fed. R. Civ. P. 56(e); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).  The party defending against the motion for summary judgment cannot defeat the motion unless he provides specific facts demonstrating a genuine issue of material fact, such that

a reasonable jury might return a verdict in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Mere assertions of a factual dispute unsupported by probative evidence will not prevent a summary judgment. *See id.* at 249–50. In other words, conclusory statements, speculation, and unsubstantiated assertions will not suffice to defeat a motion for summary judgment. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc); *see also Abbott v. Equity Group, Inc.*, 2 F.3d 613, 619 (5th Cir. 1993) ("[U]nsubstantiated assertions are not competent summary judgment evidence." (citing *Celotex*, 477 U.S. at 324)). Further, a court has no duty to search the record for evidence of genuine issues. *See Ragas v. Tenn. Gas Pipeline Co.,* 136 F.3d 455, 458 (5th Cir. 1998). "The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise matter in which that evidence supports his or her claim." *Id.*

## II.   ANALYSIS

As an initial matter, Merrill takes issue with Greystone's reliance on Texas law to support many of its arguments in favor of summary judgment on Merrill's breach of contract claims. This Court has already held that Merrill's breach of contract claims "sufficiently implicate[] federal law so as to warrant the creation of a federal body of law in this area." (Sept. 18, 2007 Order 10). Thus, Merrill is correct that federal common law must be applied to resolve these claims.

However, Greystone's reliance on Texas law is not necessarily inconsistent with the use of federal common law. As Merrill acknowledges, "the federal common law of contracts . . . uses 'the core principles of the common law of contracts that are in force in most states.'" *Smith v. United States,* 328 F.3d 760, 767 n. 8 (5th Cir. 2003) (quoting *United States v. Nat'l Steel Corp.,* 75 F.3d

1146, 1150 (7th Cir. 1996)).  As such, it is perfectly appropriate to apply the contract laws that have been developed in a particular state, including Texas, unless those laws are inconsistent with the laws in force in the majority of other states or previously developed principles of federal common law.  *Id.; see also* Erwin Chemerinsky, <u>Federal Jurisdiction</u>, § 6.2.3 (5th ed. 2007).

### A.    The Existence Of An Administration Contract.

Greystone moves for summary judgment on both of Merrill's claims for breach of a so-called Administration Contract on the ground such a contract did not exist between Greystone and the REMICs.  Therefore, according to Greystone, it could not have breached the Administration Contract.   In its cross-motion, Merrill moves for a summary judgment finding that the Administration Contract was an existing implied-in-fact contract between Greystone and the REMICs, which obligated Greystone to service the Loan and administer the Security in accordance with the GNMA Guide.

An implied-in-fact contract is a contract "inferred, as a fact, from conduct of the parties showing, in light of the surrounding circumstances, their tacit understanding." *Hercules Inc. v. United States,* 516 U.S. 417, 423 (1996) (quoting *Balt. & Ohio R. Co., v. United States,* 261 U.S. 592, 597 (1923)).  It contains all of the necessary elements of an express contract and carries with it the binding legal effect, the only distinction being the manner in which the parties manifest their mutual assent.  Restatement (Second) of Contracts § 4 cmt. a (1981).  In contrast to an express contract, where assent is typically manifested by words of offer and acceptance, mutual assent to enter into an implied-in-fact contract is manifested by the conduct of the parties and other circumstances showing an intent to contract.  *Id.*; *see also Kirk v. United States,* 451 F.2d 690, 695

(10th Cir. 1971).

According to Merrill, the issuer's (Reilly and later Greystone) description in the Prospectus of its contractual arrangement with Ginnie Mae to service the Loan "in accordance with generally accepted practices of the mortgage banking industry" (Pl.'s Mot. Partial Summ. J. App. 118) constituted an offer to holders of the Security to service the Loan in accordance with the GNMA Guide.  The offer was accepted by the Security holders by purchasing the Security.  The holder's purchase, as well as the monthly payments retained by the issuer for servicing the Loan and administering the Security, provided consideration.   The terms of the issuer's offer, Merrill continues, are also certain because they merely incorporate the issuer's contractual servicing obligations to GNMA, which are contained in the Guaranty Agreement and Servicing Agreement, both of which refer to the standards set forth in the GNMA Guide.  Finally, Merrill asserts that  a statement by Greystone in its "FHA Loan Servicing and Assets Policies and Procedures" (the "Policies and Procedures Manual" or "Manual") that it "has a fiduciary responsibility to . . . investors to service the loans in accordance with acceptable standards for mortgage servicing"  (*Id.* at 310) is further evidence of Greystone's intent to obligate itself to the Security holders to service the Loan under the standards set forth in the GNMA Guide.

The evidence proffered by Merrill is insufficient to create a genuine issue of fact that Greystone, by its conduct and other circumstances, made a contractual offer to the REMICs to service the Loan in accordance with GNMA standards.  Even viewing the facts in the light most favorable to Merrill, the Court concludes that a reasonable jury could not find that Greystone's representation in the Prospectus that it is contractually obligated *to GNMA* to service the Loan

according to the GNMA Guide is evidence of an intent by the Greystone to obligate itself *to the holder* to do the same. Rather, when viewed in context, namely the purpose and goals of the government sponsored MBS program, this clause in the Prospects seems more properly read as simply a statement of fact that is meant to provide prospective investors with peace of mind by advising that the issuer is legally bound to service the Loan and administer the Security according to guidelines established by GNMA and the federal government. Further, should the issuer fail to adhere to its duty, GNMA has secured legal recourse. In other words, the federal government, via GNMA, will be acting as a "watchdog" over the issuer. This interpretation is strengthened by the fact that the Prospectus is a form document which is meant to be a marketing tool for a security that is backed by a preexisting mortgage and guaranteed by GNMA. The terms of the Prospectus are not open for negotiation or counter-offer, as would a traditional offer.[4]

Greystone's statement in its Policies and Procedures Manual that it owes a "fiduciary responsibility" to its investors to service the loans in accordance with acceptable standards is likewise unhelpful to Merrill's argument in favor of an implied contract. A fiduciary responsibility or duty is not the same thing as a contractual duty. "A fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." Restatement (Second) of Torts § 874 cmt. a (1979). Although the

---

[4] Greystone submits that a subsequent provision in the Prospectus, which provides, "[T]he securities will not constitute liability of nor evidence any recourse against the issuer" (*Id.* at 118), is further evidence that any representations contained in the Prospectus were not intended to form legally enforceable rights in favor of the Security holder against the issuer. The Court, however, does not find this argument persuasive, nor take it into consideration in making its summary judgment finding in Greystone's favor. The unambiguous language of the clause cited by Greystone limits liability related to the Security only (i.e., the issuer's duty to make pass-through payments to the holders), not contractual liability that may flow from the issuer's duty to service the underlying Loan.

relation may be created by contract, it may also arise from other formal relationships or informal relationships of trust and confidence, whether moral, social, domestic, or purely personal. *Cotten v. Weatherford Bancshares, Inc.,* 187 S.W.3d 687, 698 (Tex. App.—Fort Worth 2006, pet. denied). Moreover, unlike a contract, liability for breach of a fiduciary duty lies in tort and does "not depend solely upon an agreement or contractual relation between the fiduciary and the beneficiary," but results from the nature of the relationship itself.   Restatement (Second) of Torts § 874 cmt. b.  In light of the numerous circumstances under which a fiduciary duty can be formed and its differences from a contractual relationship, Greystone's admission that it owes a fiduciary responsibility to its investors is not necessarily indicative of an intent by the parties to directly enter a contract.

Because the Court has determined as a matter of law that there was not an implied-in-fact Administration Contract between Merrill and Greystone or the REMICs and Greystone, Greystone's Motion for Summary Judgment on Merrill's claim for breach of the Administration Contract is GRANTED.  Merrill's Motion for Summary Judgment with respect to the Administration Contract is DENIED.

## B.   Whether Merrill Is A Third-Party Beneficiary.

As an alternative to Merrill's claim that there is an implied-in-fact Administrative Contract between the REMICs and Greystone, Merrill claims that Security holders, such as the REMICs, are third-party beneficiaries to the Guaranty Agreement and Servicing Agreement between Greystone and Ginnie Mae.  Merrill now moves for a summary judgment finding that the Security holders are third-party beneficiaries with respect to the Servicing Agreement.  Greystone moves for a finding that Merrill is not a third-party beneficiary to either the Servicing Agreement or the Guaranty Agreement.

The law of contracts recognizes that performance of a contract will often benefit a third-party.  Restatement (Second) of Contracts § 302 cmt. e.  Nevertheless, the promisor is not under a legal duty to perform the contract for the third-party's benefit unless the third party is an intended beneficiary.  *Id.*  A third party is an intended beneficiary "if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the [contracting] parties and . . . the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance."  *Id.* at § 302(1).

To determine the parties' intent, courts look to the text and purpose of the instrument that creates the alleged obligation.  *See Roberts v. Cameron-Brown, Co.,* 556 F.2d 356, 360-362 (5th Cir. 1977) (examining the text and Congressional purpose of the HUD Handbook to determine whether HUD intended mortgagees to be third-party beneficiaries).  Under some circumstances, a beneficiary's reasonable reliance on the promise as manifesting an intention to confer a right upon him may be evidence that he is an intended beneficiary.  Restatement (Second) of Contracts § 302 cmt. d. However, a finding of reasonable reliance cannot be had where the contract contains an express statement disclaiming any intention to create third-party beneficiary rights.  *Id.* at Reporter's Note cmt. d.

### 1.      The Guaranty Agreement

Based on these principles, it is clear that by entering the Guaranty Agreement, Ginnie Mae and Greystone did not intend to confer on the Security holders a right to performance.  The most persuasive evidence of Ginnie Mae and Greystone's intent is section 1.02 of the Guaranty Agreement, which provides:

> Neither Ginnie Mae's entry into this [Guaranty] Agreement nor its operation of the mortgage-backed securities ("MBS") program is intended to create *any right of action on the part of* any borrower-mortgagor or *any other person or entity*, except as expressly provided herein or in any other instrument duly executed by Ginnie Mae.

(Pl.'s Mot. Partial Summ. J. App. 125 (Guaranty Agreement § 1.02) (emphasis added).) This unambiguous statement by Ginnie Mae and Greystone demonstrates that the promises in the Guaranty Agreement were not intended to create any right of enforcement by any third-parties, unless expressly so conferred. The Court's interpretation of section 1.02 as a general disclaimer of third-party rights is reinforced by section 8.04 of the Guaranty Agreement which does, in fact, expressly confer third-party rights on the Security holders. (Pl.'s Mot. Partial Summ. J. App. 136 (Guaranty Agreement § 8.04) (stating that Ginnie Mae's guarantee of the Security "shall inure to the benefit and advantage of all the Security Holders").) If third-party rights already existed under the Guaranty Agreement, then section 8.04's express recognition and conferral of such rights would be duplicative and unnecessary. Additionally, the inclusion section 1.02 in the Guaranty Agreement destroys any argument that it was reasonable for Merrill to rely on the Guaranty Agreement as manifesting an intention by Ginnie Mae and Greystone to grant a right of enforcement that was not expressly conferred.

Merrill attempts to rebut this unavoidable conclusion by straining to read section 1.02 of the Guaranty Agreement as only limiting third-party claims against Ginnie Mae because the provision does not explicitly reference the issuer. Merrill's reading of section 1.02 is contrary to its plain language, which disclaims "any right of action on the part of . . . any . . . person or entity, except as expressly provided." Ginnie Mae and Greystone's intent to disclaim third-party rights is further evidenced by a separate section of the Guaranty Agreement which states that Ginnie Mae "in its sole

discretion" may determine when an issuer default occurs (Pl.'s Mot. Partial Summ. J. App. 137 (Guaranty Agreement § 10.01(a))) and a provision of the GNMA Guide which states that Ginnie Mae "in its sole discretion, will be entitled to avail itself of all remedies under the applicable Guaranty Agreement, . . . [the GNMA] Guide, or applicable law." (Def.'s Mot. Summ. J. App. 82 (GNMA Guide Ch. 23-3).)

Merrill also argues that section 1.02 of the Guaranty Agreement does not disclaim third-party rights against the issuer because such a reading would render section 8.05 of the Guaranty Agreement superfluous. Section 8.05 provides, "If Ginnie Mae makes any payment to Security Holders under its guaranty, it shall be subrogated fully to the rights satisfied by such payment." (Pl.'s Mot. Partial Summ. J. App. 136 (Guaranty Agreement § 8.05).) Merrill posits that the "only rights that might be satisfied by payment to the [S]ecurity holders are the rights of the [S]ecurity holders against the issuer." (Resp. Def.'s Mot. Summ. J. 18.) Thus, according to Merrill, if there are not third-party rights against issuers, then section 8.05 would serve no purpose because there would not be any rights to be subrogated to Ginnie Mae.

Merrill is incorrect in its assumption that issuers do not possess any rights that may be subrogated to Ginnie Mae under section 8.05 of the Guaranty Agreement. The Guaranty Agreement obligates Ginnie Mae to, *inter alia*, make monthly payments on the Security to the holders in the event the issuer is not able to comply with its obligations under the Security. (*See* Pl.'s Mot. Partial Summ. J. App. 136 (Guaranty Agreement § 8.01).) The monthly payment on the Security is comprised, in part, of scheduled payments due on the underlying Loan. (*See* Pl.'s Mot. Partial Summ. J. App. 136 (Guaranty Agreement § 6.03).) It follows that should the mortgagor not make its scheduled payments due on the Loan, the issuer may not be able to comply with its payment

obligations under the Security, thereby triggering Ginnie Mae's obligation to make the monthly Security payment to the holders.  In this instance, the rights that would be subrogated to Ginnie Mae under section 8.05 of the Guaranty Agreement include the issuer's right against the mortgagor to recover the monthly Loan proceeds paid to the Security holders.  Accordingly, Merill's argument that section 8.05 of the Guaranty Agreement would be rendered superfluous by a finding in Greystone's favor on the issue of the REMICs' third-party beneficiary status is fundamentally flawed.

Greystone's Motion for Summary Judgment on Merrill and the REMICs status as third-party beneficiaries under the Guaranty Agreement is GRANTED.

### 2.      The Servicing Agreement

The Servicing Agreement, however, stands in stark contrast to the Guaranty Agreement. Unlike the Guaranty Agreement, the Servicing Agreement and related documents contain broad language evidencing an intent by the contracting parties to give the holders of the Security the benefit of the issuer's obligation to service the Loan.  For example, the first page of the Servicing Agreement states, "The Issuer agrees to be responsible and liable for servicing the mortgages . . . ."  (Pl.'s Mot. Partial Summ. J. App. 144 (Servicing Agreement).)  It is reasonable to infer that this language references  the issuer's liability to third-parities, as such a clause would not be necessary to create liability in favor of Ginnie Mae.  Further, the HUD Handbook clearly states that the issuer owes a fiduciary responsibility to the holder to service the mortgage in accordance with the HUD Handbook and any contracts the issuer may enter with the holder.  (Pl.'s Mot. Partial Summ. J. App. 172 (HUD Handbook § 2-5(b))) ("Servicing mortgagees have three sets of fiduciary relationships. . . . Second, the servicer is responsible to the investing mortgagee.").  Finally, Greystone, in its own

Policies and Procedures Manual acknowledges that it has a "fiduciary responsibility" to its investors to "service the loans in accordance with acceptable standards for mortgage servicing."[5]  (Pl.'s Mot. Partial Summ. J. App. 310.)

The sweeping statements by Ginnie Mae and Greystone evidencing an intent to benefit the Security holders by entering the Servicing Agreement  garner greater significance in light of the absence in the Servicing Agreement of a disclaimer of third-party liability.  Unlike section 1.02 of the Guaranty Agreement, there is no provision in the Servicing Agreement that limits third-party rights against the servicer or issuer.  That Greystone and Ginnie Mae included an explicit disclaimer of third-party liability in the Guaranty Agreement, but omitted such a disclaimer in the Servicing Agreement, is further evidence of an intent to confer a benefit upon the Security holders by entering the Servicing Agreement.

Thus, the Court concludes that the broad language contained in the Servicing Agreement and related documents, coupled with the absence of limiting language such as that contained in the Guaranty Agreement, create a genuine issue of fact as to whether Greystone and Ginnie Mae intended to give the REMICs or Merrill the benefit of Greystone's servicing obligations under the

---

[5]  Greystone disputes whether the REMICs or Merrill are the type of investors to which it refers in its Policies and Procedures Manual.  (Def.'s Resp. Mot. Partial Summ. J. 17-18; App. 12 (Barolak Decl. ¶ 17).) Greystone contends that the investors it references in the Manual are those with whom it has a direct and written contractual relationship in the form of a Participation and Servicing Agreement or "PSA."  (*Id.*)  The Court does not accept Greystone's position, which is belied by the language the Manual.  The relevant portion of the Manual begins by acknowledging that Greystone is under an obligation to act "in compliance with the requirements contained in the agreements that govern the relationship between Greystone, as the servicer, and the investor."  (Pl.'s Mot. Partial Summ. J. App. 310.)  These agreements, according to the Manual, are usually in the form of PSAs.  (*Id.*)  However, the manual goes on to state, "In the case of loans securitized into Ginnie Mae [MBS], the appropriate regulatory manuals or related guides outline the requirements."  (*Id.*)  Further, the Manual implies that the loans under which Greystone has fiduciary obligations to the investor include "[l]oans backed by FHA mortgages securitized into Ginnie Mae [MBS]."  (*Id.*)  That would appear to be the same type of loan at issue in this case.  Greystone's attempt at explaining away its admission of a fiduciary relationship with investors such as the REMICs, therefore, falls short.

Servicing Agreement.  The parties' cross-motions for summary judgment on Merrill's third-party beneficiary status under the Servicing Agreement are, accordingly, DENIED.

### C.      Whether Greystone Is Entitled To Summary Judgment On All Claims.

Notwithstanding Merrill's disputed status as a party to an Administration Contract or a third-party beneficiary to the Servicing and Guaranty Agreements, Greystone submits that it is nonetheless entitled to summary judgment on all of Merrill's claims, including its claims for money had and received and equitable relief, because Greystone, as a matter of law, did not commit any actionable misconduct.  Specifically, Greystone takes the position that the conduct of which Merrill complains—Greystone's repurchase of the Loan which then allowed Greystone to refinance it at a lower interest rate and issue a new Ginnie Mae guaranteed security backed by the refinanced mortgage—was authorized, without precondition or limitation, by section 4.02 of the Guaranty Agreement.  Because it had an absolute right under the Guaranty Agreement to repurchase the Loan, Greystone concludes, its decision to exercise that right does not constitute a breach of any contract or other actionable wrong.

Section 4.02 of the Guaranty Agreement grants the issuer the "option to purchase at Par any Mortgage which has been in default for a continuous period of ninety (90) days or more."  (Pl.'s Mot. Partial Summ. J. App. 130 (Guaranty Agreement § 4.02).)  Merrill does not dispute the validity of section 4.02, or that at the time Greystone exercised its option to repurchase the Loan, South Side had been in default for more than ninety consecutive days.  Instead, Merrill argues that Greystone's "option" under section 4.02 of the Guaranty Agreement to repurchase the Loan is limited by section 4.01 of the Guaranty Agreement.

Section 4.01 directs the issuer to, among other things, "conform with the servicing standards, procedures, methods, and practices" required by the HUD Handbook and GNMA Guide. (Pl.'s Mot. Partial Summ. J. App. 129-30 (Guaranty Agreement § 4.01).) The GNMA Guide, in turn, instructs issuers to "service delinquent mortgages . . . in accordance with . . . accepted mortgage lending and servicing practices, ethics, and standards." (Pl.'s Mot. Partial Summ. J. App. 249 (GNMA Guide § 18-3(A)).) More specifically, the HUD Handbook states,

> At the occurrence of the initial default event, a servicing mortgagee should be able to estimate the likelihood of reinstatement. It should have learned the reasons for the default. It should have worked with the mortgagor to develop plans to cure the delinquencey. These plans should be the basis for a plan to reinstate the loan. . . . An action plan for reinstatement or assignment of the mortgage should be in place.

(Pl.'s Mot. Partial Summ. J. App. 197 (HUD Handbook § 2-41(a)).) Merrill asserts that Greystone did not service the Loan in accordance with the above cited provisions of the GNMA Guide and HUD Handbook, thereby breaching section 4.01 of the Guaranty Agreement. Greystone's antecedent breach of section 4.01, according to Merrill, prohibited it from exercising its option under section 4.02.

Greystone responds by observing, albeit cursorily, that the servicing obligations about which Merrill complains arise "at the occurrence of initial default." By the time the Loan was assigned from Reilly to Greystone on July 1, 2004, the Loan had been in default since October 1, 2003—a full nine months. Thus, Greystone implies that the servicing obligations for delinquent mortgages provided by the GNMA Guide and the HUD Handbook were not applicable to Greystone, and that by the time Greystone became the issuer it was entitled under section 4.02 of the Guaranty Agreement to immediately repurchase the Loan.

Viewing the facts in the light most favorable to Merrill, as the non-moving party on this

issue, the Court concludes that Greystone is not entitled to summary judgment on any of Merrill's

claims on the ground that section 4.02 of the Guaranty Agreement insulates Greystone from liability.

Even assuming that Greystone's interpretation of the Guaranty Agreement is accurate and it was not

bound, for example, by section 2-41(a) of the HUD Handbook to work with South Side to create an

"action plan for reinstatement or assignment" of the Loan, there exists a genuine issue of fact as to

whether Greystone induced South Side to default *before* Greystone became the issuer.  Merrill's

Amended Complaint alleges that sometime in 2003, before Reilly and Greystone executed the

Assignment Agreement, South Side and Greystone conspired  to convince HUD to waive the

Prepayment Provision, thus allowing Greystone to refinance the Loan at a lower interest rate and

sell a new security to a new investor backed by the newly refinanced loan.  (Am Compl. ¶¶ 21, 24-

29.) To achieve this end, Merrill further alleges that "South Side, with the cooperation of Greystone,

engineered an ongoing default by intentionally missing payments" (*Id.* at ¶ 26(a)), Greystone then

succeeded Reilly as the issuer of the Security (*Id.* at ¶ 30), and finally "Greystone, alone and in

concert with South Side caused the Security to be terminated [by exercising its option under section

4.02 of the Guaranty Agreement], refinanced the Loan, caused HUD to insure a new loan then issued

a new security to a new investor at a substantial, unjustified profit" (*Id.* at ¶ 39).

Greystone has not offered any evidence to specifically rebut these factual allegations.

Instead, Greystone relies on the fact that HUD apparently made an independent determination that

South Side's default on the Loan was genuine and not contrived.  (Reply Def.'s Mot. Summ. J. 9;

Resp. Pl's Mot. Partial Summ. J. 6-9).  As the Court has recognized in a prior order, the resolution

of Merrill's claims requires a determination of  "whether Greystone wrongfully induced HUD into

overriding the Prepayment Provision."  (Sept. 18, 2007 Order 11.)  Thus, Greystone cannot rely on

HUD's determination that South Side's default was credible as evidence that a conspiracy did not exist because such a finding was one of the goals of the alleged conspiracy.[6]

The issue of whether Greystone and South Side contrived South Side's default is material. Greystone's option to repurchase the Loan under section 4.02 of the Guaranty Agreement is conditional upon the Loan being "in default for a continuous period of ninety (90) days or more." (Pl.'s Mot. Partial Summ. J. App. 130 (Guaranty Agreement § 4.02).)   As the Eighth Circuit, drawing from Supreme Court precedence and various common law and secondary authorities, has succinctly opined,

> It long has been held that if the occurrence of an event which triggers the discharge of a promissor's obligation is caused by the promissor's culpable misconduct, the legal duty will not be discharged. At [its] heart the prevention doctrine, as it has been called, is merely a corollary to the general principle that equity will not permit one to rely on one's own misconduct.

*In re Stevenson Assoc., Inc.,* 777 F.2d 415, 419 (8th Cir. 1985) (citations omitted).   Stated differently, if Greystone conspired with or induced South Side to default on the Loan, as Merrill alleges, then South Side's default does not relieve Greystone of any legal duties that would otherwise have been discharged by a default.   As the prevention doctrine has its roots in equity, the Court cannot conceive of any reason why it should not apply in this instance simply because Greystone did not succeed Reilly as the issuer until after it had allegedly started the proverbial wheel rolling on South Side's default.

Finally, even if section 4.02 of the Guaranty Agreement did relieve Greystone of liability for

---

[6] Greystone also criticizes Merrill for failing to tailor its evidence in opposition to Greystone's Motion for Summary Judgment on this issue.  However, Greystone, as the moving party, bears the initial burden of demonstrating the absence of a genuine issue of fact as to the allegations cited above. *Celloтex,* 477 U.S. at 323. Greystone has not discharged its initial burden.  The Court, therefore, need not determine at this stage whether Merrill has provided adequate summary judgment evidence to support its allegations in the Amended Complaint.

Merrill's breach of contract claims, it is inapposite to Merrill's claims for money had and received and equitable relief. These later claims do not allege that Greystone's actions breached any contractual duties to Merrill, but rather constitute inequitable conduct from which Greystone should not profit. (*See* Am. Compl. ¶¶ 88-91; 96-101.) Greystone's purported compliance with a contractual provision to which the Court has determined Merrill was not a party (or a third-party beneficiary) does not, by itself, relieve Greystone of liability for claims based on principles of equity.[7] Greystone's Motion for Summary Judgment on all of Merrill's claims, including its claims for money had and received equitable relief is DENIED.

## MOTIONS TO STRIKE

Merrill moves to strike portions of the Declaration of Robert Barolak, which Greystone submitted as part of its Appendix to its Response to Merrill's Motion for Partial Summary Judgment. In partially granting summary judgment in Greystone's favor, the Court did not rely on or credit any of the disputed statements contained in Mr. Barolak's Declaration. It is, therefore not necessary for the Court to consider the merits of Merrill's Motion to Strike the Declaration of Robert Barolak and it is DENIED as moot.

Merrill also moves to strike that portion of Greystone's Reply Brief in Support of its Motion for Summary Judgment which purports to incorporate certain arguments raised by Greystone in its Brief in Opposition to Merrill's Motion for Partial Summary Judgment. The specific arguments that Merrill moves to strike from Greystone's Reply Brief are: (1) Merrill does not have standing; (2)

---

[7] Although an action for money had and received is one at law, *Peerless Insurance Co. v. Texas Commerce Bank-New Braunfels, N.A.*, 791 F.2d 1177 (5th Cir. 1986), it is equitable in nature and "belongs conceptually to the doctrine of unjust enrichment" *Phippen v. Deere and Co.*, 968 S.W.2d 713, 725 n. 1 (Tex. App—Texarkana 1998, no pet.).

the assignment from the REMICs is invalid; and (3) Merrill is trying to, but cannot, bring a private right of action under the National Housing Act.

With respect to the first two arguments, Greystone acknowledges that it did not move for summary judgment on those grounds. (Def.'s Resp. Pl.'s Mot. Strike Def.'s Mot. Summ. J. Reply 2.) As for the later, the Court agrees with Merrill that in its initial brief in support of summary judgment, Greystone did not affirmatively raise the argument that Merrill was attempting to bring an implied right of action under the National Housing Act—a claim that Greystone asserts is not permitted under Fifth Circuit precedence. Rather, Merrill proffered that line of attack for the first time in its Reply Brief in Support of its Motion for Summary Judgment. Contrary to Merrill's suggestion, the authority cited in its initial summary judgment brief to the effect that Ginnie Mae did not intent to create an implied right of action is not tantamount to the argument raised in its summary judgment reply brief that the Fifth Circuit has held such a claim in not actionable. As this Court has previously opined, it is improper to consider an argument in support of summary judgment raised for the first time in the movant's reply brief. *Kelley-Hill v. Ingram,* No. 3:04-cv-1832-P, 2006 WL 2370602, at *6 n. 3 (N.D. Tex. Aug. 16, 2006) (Solis, J.). Indeed, granting summary judgment on the basis of an argument to which the non-moving party was not given an adequate opportunity to respond—such as one advanced for the first time in a reply brief—is reversible error. *See John Deere Co. v. Am. Nat'l Bank, Stafford,* 809 F.2d 1190, 1192 (5th Cir. 1987).

Moreover, even if Greystone had timely raised the argument that Merrill's claims amount to a private cause of action under the National Housing Act, such a stance would nonetheless fail

to justify summary judgment in Greystone's favor.[8]  Merrill relies on *Roberts v. Cameron-Brown Co.,* 556 F.2d 356, 362 (5th Cir. 1977) for the proposition that "a private party is not a third-party beneficiary of agreements between a mortgagee and HUD since HUD and the mortgagee 'would have to intend that the mortgagor have an enforceable right.'"  (Def.'s Mot. Summ. J. Reply 8 (quoting *Roberts*, 556 F.2d at 362).)  The Fifth Circuit's decision in *Roberts*, however, is not controlling on the facts of this case.  The relevant portion of the *Roberts* decision involved the resolution of whether a mortgagee's obligations under the HUD Handbook, alone, created third-party beneficiary status in favor of the mortgagor.  *Roberts,* 556 F.2d at 361-62.  In contrast, Merrill alleges in this case that its third-party beneficiary status was created by the Servicing Agreement–an express contract–which incorporates relevant provisions of the HUD Handbook as well as the GNMA Guide.  Similarly, the *Roberts* court's interpretation of HUD's intent was limited to the provisions of the HUD Handbook only.  *See id.* at 362.  Here, the Court discerns the intent of Ginnie Mae and Greystone by looking to a more diverse source of documents, as well as the purpose of the government sponsored MBS program as a whole.  In that vein, while the purpose of the MBS program bears some similarities to encouraging private mortgagees to invest in low income housing, which was the government initiative at issue in *Roberts*, the purpose of the two programs and the incentives thereunder are also markedly different.  For all of these reasons, the Fifth Circuit's decision in *Roberts*, that the HUD handbook does not operate as a contract between the government and private mortgagees under which mortgagors are third-party beneficiaries, is not dispositive of Merrill's third-party beneficiary status in this case.  Merrill's Motion to Strike Greystone's argument

---

[8]  As the Court has granted summary judgment in Greystone's favor on Merrill's claims for breach of an implied-in-fact Administration Contract, the Court's present discussion is limited solely to the issue of Merrill's status as a third-party beneficiary.

to that effect is GRANTED.

Greystone, for its part, moves to strike various evidence Merrill submitted as part of its Appendix to its Motion for Partial Summary Judgment.  None of the evidence contested by Greystone was relied upon by the Court in partially denying summary judgment in Greystone's favor.  As such, Greystone's Motion to Strike is DENIED as moot.

**CONCLUSION**

For the reasons stated herein, Merrill's Motion for Partial Summary Judgment is DENIED. Greystone's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART. Summary judgment in Greystone's favor is GRANTED on Merrill's claims for breach of an Administration Contract and breach of the Guaranty Agreement.  Summary judgment is DENIED on Merrill's claims for breach of the Servicing Agreement and its remaining claims against Greystone for money had and received and equitable relief.  Each of the parties' Motions to Strike are DENIED as moot, except that Merrill's request to strike Greystone's argument that Merrill is attempting to bring a private right of action under the National Housing Act, which Greystone did not urge in its initial brief in support of summary judgment, is GRANTED.

**IT IS SO ORDERED**.

Signed this 18th day of August, 2009.

_____
JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE